**EXHIBIT "D"**



**TIMOTHY J. MICHALS, M.D., P.C.**
125 South 9th Street
Suite 1003
PHILADELPHIA, PA 19107
215-829-0331
Fax: 215-829-0338

<u>**CONFIDENTIAL**</u>                                         October 9, 2003

Joseph J. Santarone, Jr., Esquire
Marshall, Dennehey, Warner,
Coleman & Goggin
One Montgomery Plaza
Suite 1002
Norristown, PA  19401-4814

RE:  Candace Ray
     <u>Candace Ray v. Abington Township</u>
     Your File:     04108.353.082
     USDC#:         02-4382

Dear Mr. Santarone:

At your request, I have conducted a psychiatric evaluation of
Ms. Candace Ray in my office in Philadelphia, Pennsylvania on
September 24, 2003 and am forwarding the report of that evaluation.
Prior to my examination, I informed Ms. Ray that I was a psychi-
atrist and had been asked by your office to evaluate her, that
I would not be treating her and what we discussed was not confi-
dential since I would be forwarding the report of my evaluation
to your office and could be further involved in this matter
including testifying. She understood the purpose of the examina-
tion and gave her consent to be examined. Ms. Ray had previously
been scheduled to be examined on August 5 and September 9, 2003.

<u>**RECORDS REVIEWED:**</u>

In addition to my clinical examination, I have received and
reviewed copies of the records and reports which you had forwarded
related to this matter.

<u>**HISTORY PROVIDED BY MS. RAY:**</u>

Ms. Candace Ray is a thirty-four year old female who states that
she has been engaged to John J. Grob for approximately three years.
They have lived at their current address for seven years.  They
have a two year old daughter.  She is currently taking no medica-
tion nor receiving any medical care or treatment.  In the past,

Joseph J. Santarone, Jr., Esquire
RE:  Candace Ray
October 9, 2003

she states that she has taken medication.  She describes herself
as Bipolar.  She states that she is reluctant to take medication
because she is afraid she will be given the wrong medication.
She states that Dr. Cecelia Woods, a psychiatrist in the Abington
area whom she has seen on and off for years, has told her that
she should take Omega III fatty acids for that condition.  She
states that she has eaten a lot of fish which are a good source
of Omega III fatty acids.

Ms. Ray provided the following history concerning this matter.
She was asked to provide her history utilizing her independent
memory which I identified as what she actually recalls concerning
this matter, rather than what she has learned or been informed
of.  She identified the date of the incident as being Sunday,
July 2, 2002.  She stated that she was home that morning at her
current address with John.  She stated that she was having a
Bipolar incident.  She stated that she blacked-out.  She defined
blacking-out as not remembering what was going on.  She stated
that she could walk or talk and had no recollection of events.
She stated that she did not lose consciousness when she blacked-
out.  She stated that she was not aware of what was happening
while it was going on.  She stated that she had no recollection
of calling the police, but she understood that she did call the
Abington Police.  She stated that she had no memory of those
events, but stated that she called the Abington Police because
she had spoken to a friend of hers, Chris Stewart, who came to
the house.  She stated that Chris was there when she came out
of the episode that she was experiencing.  She stated that Chris
told her that she had called the police concerning John.  She
stated that she had no memory of calling the police concerning
John.  Afterwards, Chris told her that she had called the police
and they had arrested John.  She did not know why he was arrested.
She stated that John was taken to the Abington Police Station.
She stated that she was upset and crying intermittently at that
time.  She stated that she told Chris that she had called the
police when she was in an episode and she had no recall of what
had occurred.  She stated that Chris stayed with her because she
was upset.  She was taking no medication nor receiving any treat-
ment at that time that she could recall.  In the past, she had
been treated for her psychiatric problems.  She stated that she
had learned that she was allergic to #1 blue dye which comes from
shellfish.  In 1999, she had been prescribed Zoloft at the Abington

2

Joseph J. Santarone, Jr., Esquire
RE: Candace Ray
October 9, 2003

Hospital and stated that she had an allergic reaction which affected her breathing. She stated that she had learned that the dye was also in the medication Zoloft. She did not know that at the time. In March of 2000, she stated that she had a food allergy when she was eating food and developed hives. She stated that she had eaten the food in the past and she guessed the allergy was to seasoning. She also stated that she had problems of an allergic nature when she had taken Benadryl and developed hives.

She stated that she was receiving no psychiatric treatment in July of 2000 because she had no finances or any means of trans-portation. She stated that she thought the most recent psychiatric treatment prior to July of 2000 which she had received had been at the Northwestern Psychiatric Institute. She stated that she had been hospitalized at that facility on four or five occasions and had been treated by a number of doctors on the staff as an out-patient. She did not recall if she received any psychiatric treatment in the year 2000. She had been transferred from the Abington Hospital on one occasion and admitted to the Northwestern Psychiatric Institute. She did not recall the names of any psychi-atrists at the Northwestern Institute either as an in-patient or an out-patient.

She stated that later on July 2, 2000, she was sitting on her front porch. She stated that she saw an Abington Police car drive by on four occasions and had the thought that something was going on. She stated that she had called the police inquiring about the amount of bail for John, but she was never informed of that amount. She stated that she did not think, but got into her car and followed the police car to see what was going on. She stated that Chris told her not to go, but she was upset. She stated that she followed the police car to the office of Magistrate Juanita Price. She stated that she had a hard time remembering what went on. She stated that she entered the magistrate's office and no one was in the front room, but she heard noises in the back room. She stated that Judge Price was in the courtroom and John was present. She was not sure if there were other people there. She stated that she asked to speak to the judge. She stated that she wanted to tell the judge that it was her fault that John was arrested. She stated that she wanted to tell the judge that she had had a Bipolar episode. She stated that the judge asked her to leave and she left the courtroom. She stated

3

Joseph J. Santarone, Jr., Esquire
RE:  Candace Ray
October 9, 2003

that she was followed by Officer Nesbith, an Abington police
officer.  She stated that Officer Nesbith told her not to come
back on the property of the magistrate.  She stated that she did
not want to leave.  She stated that she was upset and was not
herself.    She was not sure if she accurately conveyed the
information that she wanted to to the magistrate.  She got into
her car and drove to Glenside.  She stated that she was crying.
She stated that she stopped because she was going to go into an
episode.  She stated that she had gone into these episodes over
the years and was aware of when an episode was coming on.  She
was teary when providing this information.  She stated that it
was hard for her to talk about this.

She stated that she had been very traumatized by this episode.
She stated that she was upset and drove to Glenside.  She did
not remember where she drove and stated that she had no clear
recollection.  She then drove back and stopped her car on the
street in front of the magistrate's office.  She stated that she
was crying and she could not see to drive.  She stated that she
just happened to park, but was not in the parking lot and was
on the street.

She stated that her next independent memory was that of being
in the Emergency Room of the Abington Hospital and hearing a nurse
telling her that she had given her an injection to calm her down.
She stated that she learned that she was brought in by the police
for an evaluation.  She stated that she has learned what happened
since then, but was not sure at that time what had happened.
She stated that she and Chris were on CB's communicating with
each other when she was in her vehicle at the magistrate's office.
She stated that her lawyer, Greg Zeff, said that the police had
a different story of what happened.  She stated that Chris said
that he came up as the police took her away.  He said that he
saw Police Officer Nesbith approach the car.  It was not clear
if she called Chris or if Chris called her on the CB.  Her handle
was "Lady 44" and Chris' handle was "Running Junker 200".  She
stated that she thought she was having an episode.  She stated
that Chris said that she was never parked any place other than
the street in front of the magistrate's office.

4

Joseph J. Santarone, Jr., Esquire
RE: Candace Ray
October 9, 2003

She stated that she had learned that she reportedly attempted to run down Officer Nesbith with her car at a high rate of speed. She stated that she knew she did not do that because she was not that type of person and she respected the police. She also stated that she had learned that she slapped Officer Keane, a female police officer. She stated that she would not do that because she did not do things like that. She stated that this occurred when the officers were macing her. She stated that she did not intentionally slap Officer Keane. She did not know if there were other police officers involved at that time. At the hospital, she stated that there were three or four police officers present. She stated that she was charged with one felony and five or six misdemeanors. She did not recall any of the charges. She stated that at the hospital, the nurse said she was to be evaluated by a doctor, but she did not know if she had a psychiatric evaluation. She stated that she refused an evaluation by a social worker, Mark Shnea. She stated that that occurred before she got the injection. She was transferred from Abington to Building 50 at the Norristown State Hospital where she was hospitalized for four days.

She stated that she was told that she was in four-point restraints when she was in the Abington Hospital. She claimed that they said she had violent behavior. She stated, "I know it didn't happen", even though she had no memory of that. She also stated that she recalled Mark talking to the police and informing them that she did not take a medication. She stated that Mark made the comment that they should lock her up and throw away the key. She stated that they laughed at that time. She stated that Mark showed her her medical records at that time.

She stated that she was also experiencing burning in her vagina, anus, and armpits. She related this to being maced. She stated that she was wearing a short tee shirt and shorts at the time of the incident. She also stated that her eyes bothered her.

She stated that her vagina burned the most. She asked for a shower, but was denied that by the nurse. She stated that the nurse gave her a washcloth.

5

Joseph J. Santarone, Jr., Esquire
RE:  Candace Ray
October 9, 2003

She stated that she was given a second injection to calm her down.
However, she stated that she was in restraints and had no need
for a second injection. She later identified that she was treated
with Haldol. She stated that she was given injections because
she had refused to be evaluated by Mr. Shnea. She stated that
she had seen Mr. Shnea before when she was participating in the
partial hospitalization program at Abington where he was working.

Ms. Ray stated that she did not recall what criminal charges were
brought against John. She thought that it had something to do
with a violation of his probation. At some point, he was trans-
ported to the Montgomery County Correctional Facility. She later
stated that he went home. She stated that he was represented
by a public defender. She stated that his case was heard by Judge
Nicholas. She stated that Michael Johns was the first public
defender assigned to represent her boyfriend. However, she stated
that Mr. Johns went to the Norristown State Hospital when she was
admitted and was representing her in her commitment hearing.
She stated that he got her to sign a paper at that time. She
stated that she was in a drugged state and did not know what she
had signed. She stated that Mr. Johns informed her that there
was a court hearing and she did not have to attend. She questioned
how he would represent her at the hearing if she was not there.
She stated that at the time of this incident, she weighed approxi-
mately 150 pounds and had been given two injections of Haldol
at the Abington Hospital. She stated that the medication was
to calm her down. Also, she received an injection when she was
admitted to Building 50. She stated that she was admitted to
Building 50 on Sunday after 12:00 P.M. and they "shot me up" and
she did not wake up until Tuesday. She stated that she could
hardly move and she was groggy and lethargic at that time. She
stated that she called John at their home and questioned what
was going on. She stated that John informed her that she had
been stripped when she had been taken to the Abington Police
Station. She then stated that she went from the magistrate's
office to the Abington Police Station and then to the Abington
Hospital. She stated that when she was at the police station,
she could not think straight and her mind was not working.

Joseph J. Santarone, Jr., Esquire
RE:  Candace Ray
October 9, 2003

She stated that she questioned if the commitment hearing occurred.
She stated that she was committed to out-patient treatment for
twenty days, but she was not sure if the commitment occurred.
She stated that when she met with Mr. Johns, he provided her with
no information.

She then stated that her boyfriend had a second public defender
for his charges.  She stated that she was not sure of what sentence
he received.  She thought that it was related to the fact that
he was arrested while he was on probation, but she was not sure.
She stated that John was forty-six years of age and they had been
together for four years.

Following her discharge from Norristown State Hospital, she was
committed for out-patient treatment at the Creekwood Center which
was associated with the Abington Hospital and was located in Willow
Grove.  She stated that she was committed to twenty days of out-
patient treatment.  She stated that the first six or seven days,
however, she was in the Montgomery County Correctional Facility.
She then stated that she was transferred from Building 50 at the
Norristown State Hospital to the Montgomery County Correctional
Facility.  She stated that she was at a hearing by a second
magistrate, Justice Silverman.  She stated that she did not know
what the charges were because she was so upset.  She expressed
the thought that the criminal hearing really occurred and the
commitment hearing never occurred.  She stated that she had been
provided only with parts of the records concerning the commitment
hearing.  She stated that she was not sure what happened because
things were so disorganized.  She stated that she started to call
the courthouse in Norristown to find out what was going on, but
only got half of the story.  She then called Judge Dougherty and
talked to a member of his staff.  She stated that Judge Dougherty
and Judge Price were the magistrates in Abington.  She stated
that she learned from one of his staff that a warrant for her
arrest was issued after she did not show up for her criminal
hearing.  However, she stated that she was in Building 50 at that
time.  She stated that there was a criminal hearing held without
her knowledge.

7

Joseph J. Santarone, Jr., Esquire
RE:  Candace Ray
October 9, 2003

She stated that she was in jail for six or seven days during the
period of time that she was court-committed for out-patient care.
She stated that she received a letter about the commitment when
she went home from the Montgomery County Correctional Facility.
She stated that she had gone to the facility for out-patient
treatment, but she did not recall whom she saw, what type of
treatment, or how many times she was seen.  She stated that she
inquired and no one could tell her who was the judge that was
involved in this case.

She stated that at one point, she tried to hang herself in her
home.  She was teary when providing this history.  She stated
that she did that because of how she was emotionally affected
by the police.  She stated that she was walking her dog by a Wawa
and there was a lieutenant and two police officers in the parking
lot discussing her case.  She stated that they did not know that
she was out of jail and that she was listening to them talk about
her.  She stated that that was very upsetting.  She stated that
she was represented by a public defender because she had no funds.
She stated that she had not worked for a while nor had John.
In the past, she stated that she worked at NovaCare and John worked
as a landscaper.

She stated that there was another incident in which a police
officer was in her face screaming at her.

When she was questioned concerning what psychiatric treatment
she had received since this incident, she stated that she was
seen by a psychiatrist and a female therapist in Norristown.
She did not recall their names, their office locations, or how
long she was seen.  She stated that she went there to try to deal
with what was going on.  She stated that this occurred after she
tried to hang herself.  She stated that she had financial problems
and had difficulty with transportation and it would take her two
hours to get to the appointments by bus.  Additionally, her
daughter was born on June 10, 2001 at the Abington Hospital.
She was not treated with any medication at that facility.

She admitted that she also tried to hang herself when she was
in police custody in a cell at Abington Hospital.  She claimed
that she tried to hang herself on two occasions at that time.

8

Joseph J. Santarone, Jr., Esquire
RE: Candace Ray
October 9, 2003

Additionally, she stated that the police used excessive force when she was arrested. She stated that she was in her car when she was maced. She stated that the police had harassed her for the past year and a half. She expressed her opinion that the police and district attorney's office postponed her court date for a year and a half which caused her financial expenses. She stated that she found guilty of the criminal charges that she was facing and was given a twenty-five dollar fine. She did not know what the criminal charges were.

She stated that records concerning her medical and legal involvements were not complete.

## PAST PSYCHOLOGICAL/PSYCHIATRIC HISTORY:

Ms. Ray stated that she had a history of psychiatric treatment beginning before the age of fifteen. She stated that she had been diagnosed as having a Bipolar Disorder. She had been hospitalized at numerous facilities including Abington, North-western, Grand View Hospital, and Building 50 at the Norristown State Hospital. She also had been hospitalized when she was younger in Delaware County. She did not recall the names of those hospitals. She stated that when she was in Building 50, she was given the diagnosis of Obsessive-Compulsive Disorder and had not been diagnosed with that condition in the past.

## PAST MEDICAL AND SOCIAL HISTORY:

Past medical and surgical history revealed that she did not recall if she had been hospitalized for any significant medical or sur-gical problems. She denied any accidental or traumatic injuries including car accidents, slips and falls, assaults, work injuries, or athletic injuries. She stated that had been sexually abused by her stepfather, Bob Carson, between the ages of ten and a half and thirteen. She also stated that she was physically abused by her older brother who beat her and her siblings. She stated later that she had been involved in a car accident in the past with no injuries. She denied any head injuries, loss of conscious-ness or seizure disorder. She denied any other significant change in her vision, hearing, smelling, taste or touch. She denied any history of any sexual problems or dysfunctions. She stated that she was allergic to blue dye #1. She also was allergic to

9

Joseph J. Santarone, Jr., Esquire
RE: Candace Ray
October 9, 2003

Elavil when she was in the Grand View Hospital. She had smoked cigarettes since she was nine years of age and stated that her cigarette smoking had increased since this incident. She had a problem with alcohol consumption and received treatment, she thought, in 1999, but did not recall where she was treated or the name of her treater. She denied ever using any drugs. She denied using any over-the-counter medication on a regular basis.

**FAMILY AND SOCIAL HISTORY:**

Family and social history revealed that she was born in Alabama. She is the youngest of seven siblings, having four brothers and two sisters. She stated that her natural father died when she was a baby. She stated that she was abused by her stepfather and she ran away from home when she thirteen years of age. She stated that she lived on the streets for two years. At age fifteen, she met Gary Naiditch and lived with him until she was twenty-five. She stated that her mental disorder had affected that relationship. She attended school until the sixth grade. However, she stated that she was able to read and write. She stated that she had been arrested in the past in Delaware County in an incident which she related to her Bipolar Disorder. She was unable to recall when, why, or the outcome of the charges.

**MENTAL STATUS EVALUATION:**

Mental status examination revealed Ms. Ray to be a casually groomed woman who stated that she was approximately 5 feet 1 inch tall, weighed approximately 200 pounds, and was right-handed. She stated that she weighed approximately 140 pounds at the time of this incident. She remained seated throughout the examination. Her speech varied appropriately in its rate and volume. She was able to hear my questions and responded to them with timely responses. At times, her responses were tangential to the questions that were asked. She was able to be redirected and focused and responded with answers to the questions. She was somewhat distractible intermittently throughout the evaluation. She frequently answered questions stating that she did not remember as well as that she did not recall because she was having a Bipolar episode. She also stated that she had blacked-out. There was a paranoid element to her thinking. However, there was no overt delusions. There was no evidence of the presence of any hallucinations.

10

Joseph J. Santarone, Jr., Esquire
RE:  Candace Ray
October 9, 2003

Her affect varied during the examination.  She became teary when providing some of the history.  There was an inconsistency in her responses.  She would initially state that she did not remember the answer to a question and later independently provide information that would answer the question.  She was not thought to be a reliable historian.

## PSYCHOLOGICAL TESTING:

In addition to my clinical psychiatric examination, psychological testing was administered utilizing the Minnesota Multiphasic Personality Inventory-II (MMPI-II).  A copy of the interpretive report of the psychological testing is attached.  She took an extensive amount of time to complete the testing.  She stated that she did not know the answers to many of the questions.  Ms. Ray omitted 6 questions on the testing.  Although the testing was probably valid, it may show some exaggeration of symptoms. Her profile presents a rather mixed pattern of symptoms in which somatic reactivity under stress is a primary difficulty.  Her complaints many be vague, may have appeared suddenly after a period of stress, and may not be traceable to actual organic changes. Individuals with similar profiles tend to be somewhat passive-dependent and demanding in interpersonal relationships.  They may attempt to control others by complaining of physical symptoms. Diagnostic considerations include a Conversion Disorder or Somatization Disorder and a Dependent Personality Disorder.  She is likely to be resistant to mental health treatment because she has little psychological insight.  She harbors many negative work attitudes that could limit her adaptability in the work place.

## RECORDS REVIEWED:

In addition to my clinical examination, I have received and reviewed the records and reports related to this matter.

A copy of the Civil Action Complaint identified that on July 2, 2000, the Abington Police were called to the home of Candace Ray due to a domestic dispute.  Ms. Ray was having a Bipolar episode at the time of the domestic disturbance and Mr. Grob was her fiance.  The Complaint stated that Ms. Ray did not wish to press any charges against her fiance and requested that the police allow Mr. Grob to leave the premises voluntarily and Mr. Grob was

11

Joseph J. Santarone, Jr., Esquire
RE: Candace Ray
October 9, 2003

arrested. When she went to her fiance's arraignment to bail him
out, she was told to leave the arraignment and she did leave
voluntarily. She drove off the premises, but drove the wrong
way and turned the car around and stopped in front of the district
magistrate's building on Easton Road. She talked to Mr. Stewart
on a CB saying that a policeman was coming. Officer Nesbith
approached her car and she drove forward and the officer was
knocked down accidentally because his head and upper body were
inside the plaintiff's car window. He grabbed the keys out the
ignition of the car. She was apprehended by the police and was
pepper sprayed by Office Keane. She was taken to the Abington
Police Station where she was isolated, stripped naked, and hosed
down with water while police watched and made comments.

At the Abington Hospital, she was given medication and was seen
by Mark Shnea and was placed in four-point restraints. She stated
that Mr. Shnea defended Officer Nesbith and falsified hospital
records and police reports to have her involuntarily committed
to the Montgomery County Emergency Services.

Michael Johns, Esquire, the public defender, came to the Montgomery
County Emergency Services to represent her in a competency hearing.
Mr. Johns informed her that she could not come to the hearing
because the police were coming to pick her up and re-arrest her.
She then called Magistrate Dougherty's office and was informed
that she was being issued an arrest warrant because she was not
at the 9:00 criminal hearing and she was unaware of the hearing
because she had been involuntarily committed. In Building 50,
she was arraigned by Judge Silverman who told her if she signed
her Miranda warning, she would go home and if she did not sign
the Miranda, she would go to jail. She stated that she did not
sign the Miranda because she did not remember reading the rights.
She was taken to the Abington Police Station on July 7, 2000 at
which point, she attempted suicide in her cell. She was then
taken to the Montgomery County Prison where she was for six days
and was placed on a suicide watch.

I have reviewed and considered a copy of the deposition transcripts
of Ms. Ray taken on February 21 and March 12, 2003. Ms. Ray stated
that she was fired from her position as a result of a Bipolar
episode. She stated that no one ever told her that she was fired
because she had a Bipolar episode, but that was her belief. She

12

Joseph J. Santarone, Jr., Esquire
RE:  Candace Ray
October 9, 2003

stated that she was molested by her mother's husband and believes
that is the root of her disorder.  She had been arrested for a
DUI in 1995.  She stated that when she was living with Mr.
Naiditch, she had an incident as a result of a Bipolar episode
and he called the police, they arrested her, and she was 302'd
to the hospital.  She was ordered by the court to stay away from
him.  She stated that she was not aware that she was bipolar until
she started living with Mr. Naiditch for 10 years in Broomall.
She stated that she has been hospitalized on approximately six
occasions for Bipolar Disorder and had been diagnosed with that
condition in 1994.

Ms. Ray stated that she had upsets which she described as blacking
out and she would disappear for days.  She does not recall what
she did during that time frame.  She stated that drinking would
also exacerbate her problems so she stopped drinking.  She was
seen at the Rosemont Counseling Center in 1994, which was her
initial psychiatric contact.  She stated that she was taking no
medications at the time of her deposition.  She stated that she
had taken Lithium, Elavil, and Zoloft, and denied taking any
medication on July 2, 2000.  She had been on Depakote intermittent-
ly for a number of years.  She had been seen by Dr. Smith, a
psychiatrist, in Norristown.  She stated that she had been treated
for her psychiatric problems at Abington, Creekwood Center,
Milestone and the Central Program.  She had also been hospitalized
on a voluntary basis at Grandview Hospital.  She stated that she
attempted suicide on three occasions.  She was hospitalized at
the Northwestern Hospital at least three times, maybe more.  She
was also hospitalized at Abington on a voluntary as well as
involuntary basis.  She was transferred from Abington to Building
50 at the Norristown State Hospital.  She was also treated at
the Holy Redeemer Hospital in March of 2000.  She stated that
she had field for bankruptcy because Mr. Grob was in jail for
over 35 days.

Prior to July of 2000, she had contact with the Abington Police
after she attempted suicide.  She stated that she did not recall
trying to commit suicide on July 7th.

13

Joseph J. Santarone, Jr., Esquire
RE: Candace Ray
October 9, 2003

Ms. Ray stated that she was having a bipolar episode when she walked off the grounds of the Norristown Hospital. She stated that she had difficulty identifying Officer Dryer, stating that she in a pretty sad state of affairs at that time. She was questioned concerning her interaction with Mark Shnea prior to July of 2000 when she had been a patient in the Partial Hospitalization Program at Abington Hospital. She described the treatment as a joke, stating that she did not have a set course of treatment and that Dr. John Schwartz was her primary doctor at that time. She stated that she had sessions consisting of being with Mark Shnea and Gail Bidler.

Ms. Ray was questioned concerning a note from Abington Memorial Hospital on May 11, 1999 written by Mark Shnea concerning her evaluation. She stated that she had experimented with marijuana. She was struggling to survive and that is why she tried to kill herself.

If is my understanding that you are attempting to obtain the records of her psychiatric treatment. Upon receipt and review of those records, I will complete this report.

Sincerely,

Timothy J. Michals, M.D.

TJM/ede

Attachment

**RECORDS REQUESTED:**

Records of Ms. Ray's psychiatric treatment.

14

**TIMOTHY J. MICHALS, M.D., P.C.**

125 South 9th Street
Suite 1003
PHILADELPHIA, PA 19107
215-829-0331
Fax: 215-829-0338



RECEIVED
NOV 1 9 2003
04108.3.8

**CONFIDENTIAL**                          November 12, 2003


Joseph J. Santarone, Jr., Esquire
Marshall, Dennehey, Warner,
Coleman & Goggin
One Montgomery Plaza
Suite 1002
Norristown, PA  19401-4814

RE:  Candace Ray
     **Candace Ray v. Abington Township**
     Your File:      04108.353.082
     USDC#:          02-4382

Dear Mr. Santarone:

I have received and reviewed the additional records you forwarded
concerning this matter.

**RECORDS REVIEWED:**

Records from Montgomery County Emergency Services, Inc. identified
that Ms. Ray was admitted as an involuntary patient on a Section
302 on July 3, 2000.  A police officer from the Abington Police
Department was the petitioner.  The petition described the patient
as having a disruptive temperament, an altercation with a police
officer, was taken to a holding cell where she apparently made
a suicide gesture which she minimized, and was brought for admis-
sion.  She stated that she had been brought there initially for
an evaluation sometime earlier.  She had been in previous treat-
ment.  She stated that she had been prescribed a number of medica-
tions including antidepressants and anti-psychotic medications.
She reported a very disturbed life, claiming that she was sexually
abused by her stepfather when she was thirteen.  She was not a
good informant.

Joseph J. Santarone, Jr., Esquire
RE:  Candace Ray
November 12, 2003


She stated that she got into a fight with a live-in boyfriend because he wanted to change the CD on a stereo player.  She stated that she had been hospitalized in the past at Northwest Institute, but was not a good informant.  She provided a history of a long story of her boyfriend's mother being mentally ill and apparently incompetent.  She had been episodically employed as a billing clerk and had spent a significant time on Welfare and it was not clear how she was capable of being a mortgage payor on her own home.

She was described as childlike in her manner.  Facial features may have indicated that she was a product of Fetal Alcohol Syndrome with some similar developmental disturbance.  Throughout the interview, she was extremely restless.  She intermittently got up and stretched out on a table becoming grossly inappropriate socially.  Her history was suggestive of difficulty with impulse control issues (her behavior was noted in the petition subsequent to that argued similarly).  She claimed that when she was in the holding cell, she did not make a suicide gesture, but what she said was that she stood up on the toilet demanding attention and apparently complained loudly about being arrested.  She had gone to the courtroom to minimize the consequences of her having called the police to charge her boyfriend with the assault, thus facing trouble herself.  She was aware of the nature of her involuntary commitment and she understood that she may be picked up to leave due to her multiple charges against her consequent to her behavior.  The petition described the hospitalization as necessary to address the patient's potential acting out in a dangerous manner and also to assess her need for psychotropic medication, although she appeared negative about cooperating with the medications.

I have also reviewed copies of records of her treatment at the Milestones Program.  She was referred to the partial hospitalization for continuing stabilization following in-patient psychiatric treatment.  The presenting problems included recent suicide attempts, mood and behavior fluctuations including harassment of a former boyfriend, and dissociative episodes.  She was admitted on March 13, 1998.  She remained in the program until May 18, 1998.  On her last day at the program, she reported doing better.  She stated that she had decided to decrease her days at the partial program to look for employment, she never returned to the program, nor did she call to explain her absence.

2

Joseph J. Santarone, Jr., Esquire
RE:  Candace Ray
November 12, 2003


Psychiatric evaluation on March 13, 1998 included the diagnoses
of Psychothymic Disorder; Post-Traumatic Stress Disorder; Alcohol
Abuse, Episodic; and Personality Disorder, Not Otherwise Specified
(NOS).  She was treated with medications including Depakote, Ser-
zone, Melleril, Trazodone, and Neurontin.  It was noted that she
had difficulty taking independent steps for herself and she was
described as very dependent on others for basic tasks including
problem-solving.  She was resistant to information concerning
her inability to develop relationships.

She had been hospitalized at Progressions Institute of Fort Wash-
ington as an in-patient from May 11 through May 18, 1999.  She
was admitted on a voluntary basis.  She reportedly overdosed on
Zoloft after a fight with her boyfriend.  She stated that she
was in that relationship for ten years.  She had attended the
Milestones Program, but stopped taking her medications and stopped
attending the partial hospital program in the past year.  She
had a history of issues of abuse.  She was extremely depressed,
paranoid, indecisive and ambivalent with trouble staying focused,
constantly very intrusive, and had trouble processing therapeutic
feedback. She was treated with medications including antidepres-
sants and anti-psychotic medications as well as mood stabilizers.
She had trouble accepting her illness, limitations, and needs
to be working on those problems.  She made multiple indecisive
decisions.  After her discharge, she was to be followed at the
partial hospital program.  Discharge diagnoses of Bipolar Affective
Disorder, Depressed, Suicidal; Status-Post Overdose on Zoloft;
Polysubstance Dependence; Alcohol and Cannaboid Dependence, Contin-
uous; Post-Traumatic Stress Disorder; Borderline Personality
Disorder were made.  Stressors included the fact that she was
off medication, she was drinking, there was excessive drug use,
and she broke up with her boyfriend.

The records identified that she was transferred to the partial
hospital program at Eugenia on May 21, 1999.

She had previously been an in-patient at the Northwestern Institute
in March of 1998 prior to her admission to the partial hospitaliza-
tion program.

3

Joseph J. Santarone, Jr., Esquire
RE:  Candace Ray
November 12, 2003


Records from Central Montgomery Mental Health/Mental Retardation
Center identified that she was evaluated in March of 2001.  It
was noted that it was very difficult to get her to define her
chief complaint.  She reported that she was first given the diag-
nosis of Bipolar Disorder when she was eighteen or nineteen which
was her first hospitalization.  She had many hospitalizations
since then, but stated that she could not remember a lot because
"I don't remember when I have an episode".  She stated that she
had been in the hospital five times in the past five years, her
most recent being in 2000.  She had a history of depression with
suicidal ideation and previous attempts including trying to hang
herself in July of 2000.  It was thought that she had a diagnosis
of Bipolar Disorder and Rule-Out Schizoaffective Disorder.

Records from the Grand View Hospital identified that she was seen
in 1996 and diagnosed as having a Schizoaffective Disorder.  At
that time, she was on medications including Wellbutrin and Seren-
til.  She was hospitalized because she thought she would kill
herself by jumping in front of a train.  She stated that she broke
up with her boyfriend of ten years (she wanted him to marry her,
but he refused, she wanted children, but not without marriage).
She previously had taken an overdose of medications.  She claimed
that she was sexually abused and was in a foster home after twelve
years of age for two years where she was raped and then returned
home and was sexually abused again by one of her brothers.  She
had been in the Abington Hospital partial program under Dr. Pruitt.
She stated that on her father's side, she had three uncles in
mental institutions and, on her mother's side, she had one uncle
who was an alcoholic.  Her older brother overdosed on quaaludes
and alcohol.  She stated that all of her siblings had problems
at one time or another.  The diagnoses of Schizoaffective Disorder;
Alcohol Abuse by History; Panic Disorder; and Personality Disorder,
Not Otherwise Specified were made.  She agreed to be transferred
to the Northwestern Institute for in-patient psychiatric problems.

She had been seen on March 31, 1996, stating that she had been
drinking and was not happy.  She was diagnosed as having a Schizo-
affective Disorder and that she had Dissociative Disorder.

4

Joseph J. Santarone, Jr., Esquire
RE: Candace Ray
November 12, 2003

Records from the Emergency Room of the Abington Hospital identified that she was seen on July 2, 2000 when she was brought there by the police. She had been at her husband's arraignment, caused a disturbance, was escorted out by the police and told not to return, subsequently returned, subsequently escorted out, assaulted a police officer, and was brought to the Emergency Department. She had a history of mental illness. She was known to the staff and to the Building 50 personnel. She was uncooperative and refused to cooperate with the history and appeared to be in distress. A review of systems identified that she denied blurring or diplopia. The history and findings were suggestive of an acute exacerbation of chronic mental illness. She was seen by the Psychiatric Service in consultation. She was transported to Building 50. She had received 10 mg. of Haldol which resulted in a very substantial diminution of her agitation and combativeness. The clinical impression was Acute Exacerbation of Bipolar Disorder with Agitation and Medical Clearance.

She was seen in the Emergency Room on April 21, 1998 with a history of Bipolar Disorder with complaints of pain in her right forearm. She stated that the injury occurred at Milestones. The impression of an Acute Forearm Contusion was made.

Records of the Department of Psychiatry of the Abington Memorial Hospital identified an evaluation on August 24, 1998.

Copies of records of the Montgomery County Criminal Justice System included a number of charges occurring on July 2, 2000. The case was identified as 0602200. She pled guilty to defiant trespass on May 29, 2001.

A copy of a court order dated December 20, 2000 identified that upon application of Ms. Ray's court-appointed counsel, Dominic Centrella, Esquire, she was ordered to be examined by Dr. Nell on January 8, 2001 in Building 50 of the Montgomery County Emergency Services. A letter written on January 4, 2000 identified that she had received a letter on January 3, 2000 which was five days before the evaluation. However, she was disputing the name, place, and doctor who would be performing the evaluation. She also questioned why her attorney requested the evaluation. She stated that it was a conflict for Dr. Nell to perform an evalua-

5

Joseph J. Santarone, Jr., Esquire
RE:  Candace Ray
November 12, 2003


tion.  She also stated that the seventy-two hour law applied in
her case unbeknownst to Mr. Centrella.

Mr. Centrella had sent her a December 22, 2000 letter concerning
the criminal charges that she was facing and informing her that
he was her court-appointed attorney.  He had been unsuccessful
in his attempts to reach her by phone.  He enclosed a copy of
the court order for the evaluation.

I also reviewed and considered the other records which were part
of her medical file including representation by Kate Kelly.  A
report dated April 11, 2001 identified that on April 10, 2001,
Ms. Ray provided Ms. Kelly with information that there were three
witnesses to the incident on July 2, 2000 outside of the district
court.  However, she refused to provide her with the names of
witnesses due to her concerns that the three people did not want
to get involved.  She stated that two of the witnesses, Jon Grob
and Christopher Stewart, at the trial testified.

A copy of a letter to Ms. Ray by attorney Allen Denberg concerning
the incident of July 2, 2000 identified that he had completed
his investigation and would not be taking any action her behalf.

A copy of a transcript of a hearing on May 20, 2001 before Judge
Rossanese identified that Ms. Ray was represented by Kate Harper
and for the Commonwealth by Christopher Mullaney.  The trial was
earlier that morning.  All of the matters had been dismissed except
the summary offenses of disorderly conduct and defiant trespass.
Ms. Ray testified that she was attending the arraignment of her
boyfriend and when she was asked to leave, she did leave.  She
denied being boisterous or loud.  She stated that she did not
remember what happened because she was having a Bipolar episode.
She stated that she had a lot of documentation to be seen, if
the judge so desired.  She was found guilty of defiant trespass
related to coming back on the property.  She stated that she did
not remember a whole lot of what happened.  There was sufficient
evidence to find her guilty of defiant trespass.

6

Joseph J. Santarone, Jr., Esquire
RE:  Candace Ray
November 12, 2003

A copy of a transcript of a hearing before the Honorable Patrick
Zaffarano included a summary of testimony of that hearing.  Ms.
Ray was at the arraignment of her boyfriend who had been arrested
for assaulting her.  She did not want him charged and this was
why the incident occurred.  When Officer Nesbitt arrived at the
hearing, Ms. Ray insisted that she come into the room with officer
and she was disruptive.  She reported that she had Bipolar Disorder
and did not take any medication.  She appeared to understand what
she was told and she responded appropriately.  After the hearing,
her boyfriend was more appropriate.  She stated that they told
the officer that they had been harassed for following through
with reporting the police and Michael Jonn, Esquire to various
selected officials and the FBI.  The officer agreed to withdraw
both counts of aggravated assault in exchange for a waiver and
she read and signed the waiver.  The judge told her that she still
could go to trial on the remaining charges including incident
when she went to Building 50 for five days.  She spent another
six days at MCCF before bail was posted.

Copies of records from the Abington Hospital dated July 2, 2000
identified that she was seen in crisis on that date.  She came
to the hospital with the police.  She was assaultive with the
police, and tied a ring around her neck and stood on the toilet
as if to hang herself.  She refused treatment, was assaultive
towards the nursing staff, and she was placed in four-point res-
traints.  She was loud, uncooperative, and made numerous threats
of litigation.  She recognized a doctor from past encounters and
became increasingly agitated in his presence.  She refused to
answer questions or provide information and often screamed.  A
history with the police was noted.  MCES was contacted.  She was
medically cleared by a doctor and her case was discussed with
Dr. Soliman from MCES.  Transportation to the hospital was to
be arranged.

Copies of records from the Abington Township Police Department
related to these events were reviewed and considered.

Records from the Montgomery County Emergency Services related
to her hospitalization were reviewed.

7

Joseph J. Santarone, Jr., Esquire
RE:  Candace Ray
November 12, 2003

Copies of records from Montgomery County Emergency Services
identified that she was placed on assault, suicide, and elopement
procedures.  She was described as uncooperative and tearful.
She had been committed on a 302 petition.  A 304 application for
extended involuntary treatment was filed on July 6, 2000.

The 302 application for involuntary examination and treatment
identified that she was evaluated by Dr. Soliman from the Mont-
gomery County Emergency Services.  She was committed on the basis
of the petition.

Records of Dr. Al Hocfield included copies of progress notes and
laboratory studies.  She had been evaluated by him for medical
problems.

Records from the Grand View Hospital concerning her admission
in April of 1996 were reviewed.  She presented with suicidal
ideation and had thoughts of killing herself after breaking up
with her boyfriend.

Records from the Pennsylvania EMS identified that the crew was
confronted by her boyfriend who advised them that the patient
was Bipolar and was sprayed by the police and was very angry.
He entered the police station and found several police officers
standing outside of the cell.  The cell contained a lady standing
on the sink in a plastic gown yelling at the officers.  The police
advised that she was sprayed with pepper spray at approximately
18:00 hours.  She was described as uncooperative and combative.
She was let out of the cell, ripped off her plastic gown, and
sat on a litter.  She was upset about her dog which died the
previous day.  She also stated on several occasions, "She did
not want any drugs".  She complained of her skin still burning
from the spray.  She was upset and unable to control her emotions.
She was covered with a blanket for warmth and privacy at the Abing-
ton Hospital.

My review of these additional records identify a disparity between
Ms. Ray's complaints and those documented in the records.  When
she was evaluated at the Montgomery County Emergency Services,
it was noted that she had a recollection that explained her actions
in the cell.  She also does not provide a history that she was
stripped and hosed off by any police officers.  She also understood

8

Joseph J. Santarone, Jr., Esquire
RE:  Candace Ray
November 12, 2003

that she was picked up because of the criminal charges that she
was facing.

The records identified that she was admitted to the Montgomery
County Emergency Services as a result of the psychiatric evaluation
that was conducted and the commitment approved by the mental health
officers that she needed involuntary treatment.  Most of the decis-
ions were made by the psychiatrist not the police officers.  It
was also noted that when she was in the Abington Emergency Room,
her eyes were clear and she had no rash which is inconsistent
with her claims in her deposition.  Also, it was noted that she
was agitated and required an injection of Haldol.

**OPINION:**

Based on the results of my clinical psychiatric examination, review
of the records and reports, the results of the psychological
testing, and if the history provided by Ms. Ray is accurate and
reliable, it is my opinion that Ms. Ray has a longstanding history
of in-patient and out-patient treatment for psychiatric disorders.
She has attempted suicide for which she has been committed on
an involuntary basis for in-patient psychiatric treatment.  She
was treated with a variety of medications including mood stabi-
lizers, antidepressants, and anti-psychotic medications.  She
also has been diagnosed as having a Borderline Personality Disor-
der.  Her behavior is consistent with that diagnosis.  There is
a disparity between her subjective complaints related to this
litigation and the information documented in the medical as well
as the legal records.  She entered a guilty plea at the hearing
on May 20, 2001.  The records identify that she cannot be treated
as a reliable historian.  She claimed that when she has Bipolar
episodes, she is unaware of behavior.  That complaint is inconsis-
tent with features of a Bipolar Disorder.  It is my opinion that
Ms. Ray did not experience any psychiatric injuries as a result
of her claims in this litigation.  The results of the psychological
testing identify longstanding personality traits which are develop-
mental in nature.  She may experience periods of symptom develop-
ment under stress including physical pain and develop patterns
of "invalidism" where she becomes incapacitated and dependent
on others.  She may attempt to control others by complaining of
physical symptoms.  She is felt to be resistant to mental health
treatment which is consistent with her noncompliance as identified

9

Joseph J. Santarone, Jr., Esquire
RE:  Candace Ray
November 12, 2003


in the medical records.  Psychiatric disorders, which are unrelated
to claims in this litigation, merit treatment.  Given her history,
it is unlikely that she would be compliant with that recommenda-
tion.

Upon receipt and review of any additional records, if indicated,
I will forward an addendum to this report.

                                    Sincerely,

                                    Timothy J. Michals, M.D.


TJM/ede



                                    10

# General Medical
## Interpretive Report

# MMPI-2™

### The Minnesota Report™:
### Adult Clinical System--Revised

### James N. Butcher, PhD

ID Number 7251969

Candace Ray

Female

Age 34

Never Married

6 Years of Education

Date Assessed 9/24/2003

Copyright © 1989, 1993, 2001 REGENTS OF THE UNIVERSITY OF MINNESOTA. All rights reserved.
Portions reproduced from the MMPI-2 test booklet. Copyright © 1942, 1943, (renewed 1970), 1989 REGENTS OF THE
UNIVERSITY OF MINNESOTA. Portions excerpted from the MMPI-2 Manual for Administration, Scoring, and Interpretation,
Revised Edition, copyright © 2001 REGENTS OF THE UNIVERSITY OF MINNESOTA. All rights reserved.
Distributed exclusively by NCS Pearson, Inc.

"Minnesota Multiphasic Personality Inventory-2," "MMPI-2," and
"The Minnesota Report" are trademarks of the University of Minnesota.

[ 7.1 / 5.06 / 1.0 ]

**MMPI-2™**
**ID 7251969**

## MMPI-2 VALIDITY PATTERN



| | VRIN | TRIN | F | F(B) | F(P) | L | K | S |
|---|---|---|---|---|---|---|---|---|
| Raw Score: | 10 | 7 | 14 | 6 | 5 | 7 | 16 | 29 |
| T Score: | 70 | 65F | 85 | 66 | 81 | 66 | 52 | 54 |
| Response %: | 94 | 100 | 97 | 100 | 100 | 100 | 100 | 100 |

| | | | | |
|---|---|---|---|---|
| Cannot Say (Raw): | 6 | | | |
| Percent True: | 34 | | | |
| Percent False: | 66 | | | |

| | Raw Score | T Score | Resp. % |
|---|---|---|---|
| S1 – Beliefs in Human Goodness | 11 | 58 | 100 |
| S2 – Serenity | 5 | 48 | 100 |
| S3 – Contentment with Life | 2 | 42 | 100 |
| S4 – Patience/Denial of Irritability | 5 | 53 | 100 |
| S5 – Denial of Moral Flaws | 5 | 61 | 100 |

## PROFILE VALIDITY

The client omitted 6 items on the MMPI-2. Although this is not enough to invalidate the resulting MMPI-2 clinical profile, some of her scale scores may be lower than expected because of these omissions. It may be helpful to talk with her to determine the reasons for her omissions. Many clinicians prefer to readminister the omitted items (listed at the end of this report) to ensure the most accurate interpretation possible.

The pattern of her item omissions should be carefully evaluated. She omitted from 10 to 15 percent of the items on Scale Pd1. Omitting items may result in an underestimate of the problems measured by the affected scales. She omitted from 16 to 25 percent of the items on Scale Hy1. Caution should be exercised in interpreting the affected scales because scale scores are clearly attenuated by this degree of item omission. Of course, any scale elevations above a T score of 60 should be interpreted, but it should be understood that if there are omitted items, the score probably underestimates problems reflected by the scale.

This client has endorsed a number of psychological problems, suggesting that she is experiencing a high degree of stress. Although the MMPI-2 clinical scale profile is probably valid, they may show some exaggeration of symptoms.

## SYMPTOMATIC PATTERNS

This report was developed using the Hs and Hy scales as the prototype. Her MMPI-2 clinical profile presents a rather mixed pattern of symptoms in which somatic reactivity under stress is a primary difficulty. The client presents a picture of physical problems and a reduced level of psychological functioning. The client is likely to have a hysteroid adjustment to life and may experience periods of exacerbated symptom development under stress. Some individuals with this profile develop patterns of "invalidism" in which they become incapacitated and dependent on others. Her physical complaints may be vague, may have appeared suddenly after a period of stress, and may not be traceable to actual organic changes. She may be manifesting fatigue, vague pain, weakness, or unexplained periods of dizziness. She may view herself as highly virtuous and she may show a "Pollyannish" attitude toward life.

In addition, the following description is suggested by the content of the client's item responses. She has endorsed a number of items suggesting that she is experiencing low morale and a depressed mood. She reports a preoccupation with feeling guilty and unworthy. She feels that she deserves to be punished for wrongs she has committed. She feels regretful and unhappy about life, and she seems plagued by anxiety and worry about the future. She feels hopeless at times and feels that she is a condemned person. She has difficulty managing routine affairs, and the items she endorsed suggest a poor memory, concentration problems, and an inability to make decisions. She appears to be immobilized and withdrawn and has no energy for life. She views her physical health as failing and reports numerous somatic concerns. She feels that life is no longer worthwhile and that she is losing control of her thought processes.

According to her response content, there is a strong possibility that she has seriously contemplated suicide. The client attests to having more fears than most people do.

## PROFILE FREQUENCY

It is usually valuable in MMPI-2 clinical profile interpretation to consider the relative frequency of a given profile pattern in various settings. The client's MMPI-2 high-point clinical scale score (Hy) is found in 10.5% of the MMPI-2 normative sample of women. However, only 3.7% of the sample have Hy as the peak score at or above a T score of 65, and only 2.1% have well-defined Hy spikes. Her elevated MMPI-2 profile configuration (1-3/3-1) is rare in samples of normals, occurring in less than 2.7% of the MMPI-2 normative sample of women.

The relative frequency of her profile in various medical settings is informative. An extremely large number of women being evaluated in a medical context produce this high-point score. In the NCS medical sample, this MMPI-2 high-point clinical scale score (Hy) occurs in 24.4% of the women. Furthermore, 20.9% of the women have the Hy scale spike at or above a T score of 65, and 12.2% have a well-defined Hy peak at or over a T score of 65. Her elevated MMPI-2 profile configuration (1-3/3-1) is quite common among women in medical settings. This code type is found in 18.8% of the women in the NCS medical sample.

## PROFILE STABILITY

The relative elevation of her clinical scale scores suggests that her profile is not as well defined as many other profiles. That is, her highest scale or scales are very close to her next scale score elevations. There could be some shifting of the most prominent scale elevations in the profile code if she is retested at a later date. The difference between the profile type used to develop the present report and the next highest scale in the profile code was 1 point. So, for example, if the client is tested at a later date, her profile might involve more behavioral elements related to elevations on Sc. If so, then on retesting, emotional alienation, unusual thinking, bizarre perceptions of others, and a stronger tendency to engage in extreme fantasy might become more prominent.

## INTERPERSONAL RELATIONS

Individuals with similar profiles tend to be somewhat passive-dependent and demanding in interpersonal relationships. The client may attempt to control others by complaining of physical symptoms. Many women with this profile have difficulties with sexual relationships because they are overly concerned with their health and preoccupied with physical problems.

She is somewhat shy, with some social concerns and inhibitions. She is a bit hypersensitive about what others think of her and is occasionally concerned about her relationships with others. She appears to be somewhat inhibited in personal relationships and social situations, and she may have some difficulty expressing her feelings toward others.

## DIAGNOSTIC CONSIDERATIONS

Individuals with this profile typically exhibit a neurotic pattern of adjustment and would probably receive a clinical diagnosis of Conversion Disorder or Somatization Disorder. They might also receive an Axis II diagnosis of Dependent Personality.

## TREATMENT CONSIDERATIONS

The client will probably be resistant to mental health treatment because she has little psychological insight and seeks medical explanations for her disorder. She is probably defensive and reluctant to engage in self-exploration. In addition, she seems to experience little anxiety over her situation and may have little motivation to change her behavior. Some individuals with this profile respond to placebos or mild suggestion or to stress inoculation training if it is not too threatening. They will probably require long-term commitment to therapy before their personality will change substantially. However, individuals with this profile often terminate treatment early.

She harbors many negative work attitudes that could limit her adaptability in the workplace. Her low morale and lack of interest in work could impair future adjustment to employment, a factor that should be taken into consideration in treatment.

She has expressed a number of specific fears with which she is concerned at this time. Behavioral therapy to alleviate these fears might be considered.

NOTE: This MMPI-2 interpretation can serve as a useful source of hypotheses about clients. This report is based on objectively derived scale indices and scale interpretations that have been developed in diverse groups of patients. The personality descriptions, inferences, and recommendations contained herein need to be verified by other sources of clinical information because individual clients may not fully match the prototype. The information in this report should most appropriately be used by a trained, qualified test interpreter. The information contained in this report should be considered confidential.